BENITA B. PEMBERTON *vs.* NORMAN B. PEMBERTON
& another.[1]

Norfolk.   November 15, 1979. — January 3, 1980.

Present: HALE, C.J., GREANEY, & DREBEN, JJ.

*Divorce,* Separation agreement, Modification of decree, Attorney's fees.
    *Attorney at Law,* Compensation.  *Trust,* Spendthrift provision.

In proceedings seeking modification of alimony and child support provi-
    sions of a divorce decree and an adjudication of contempt, there was
    not a sufficient showing of a material change in either party's circum-
    stances to warrant the judge's refusal to charge the husband with cer-
    tain arrearages and his reduction of the support and alimony orders.
    [12-16]
In a proceeding in a Probate Court, the judge did not abuse his discretion
    in awarding attorney's fees in an amount less than was requested.
    [16-18]
In proceedings seeking modification of alimony and child support provi-
    sions of a divorce decree and an adjudication of contempt, there was
    no error in refusing to compel a bank as trustee of a spendthrift trust
    for the benefit of the husband and children to expend trust assets and
    income to satisfy the husband's arrearages and continuing support
    orders.  [18-22]

LIBEL for divorce filed on December 22, 1967.

A petition for contempt, filed on August 30, 1974, and
petitions for modification, filed on September 3, 1974, and
October 11, 1974, were heard by *Ford,* J., on a master's
report.

*Daniel F. Featherston, Jr.,* for Benita B. Pemberton.
*Edward E. Kelly* for Norman Pemberton.
*Paul E. George* for South Shore Bank, trustee.

GREANEY, J.   Norman B. and Benita B. Pemberton were
divorced by a decree absolute entered on July 29, 1971, in

---

[1] South Shore Bank, trustee.

the Norfolk County Probate Court. The decree incorporated by reference a property settlement agreement entered into by the parties on December 31, 1970, which, in so far as material to this appeal, obligated Norman to pay $1,520.83 monthly in support for Benita and their five minor children (with adjustments in the event of Benita's remarriage and the children's successively reaching age twenty-one), and required him to transfer certain common stocks to Benita, including ninety shares of New Park Mining Co. Additionally, Norman later became obligated to pay the real estate taxes on the marital home.[2] Incorporation of the agreement in the decree had the effect of ordering alimony and support in the amounts specified in the agreement and ordering compliance with its other terms. *Salvesen* v. *Salvesen,* 370 Mass. 608, 610 (1976). Norman fell behind in his obligations, causing Benita on August 30, 1974, to file a petition for contempt; Norman countered with a petition to reduce his support obligations,[3] and Benita cross petitioned for their increase. Hearings ensued before a master. The master's report, filed on October 27, 1977,[4] recommended

[2] Under the terms of the property settlement agreement, the marital home was placed in trust for the use and benefit of Benita and the children. The trustees were obligated to pay local real estate taxes and expenses related to the property. To accomplish this, the agreement further provided that Norman would authorize the trustee of his father's trust to pay the trustees caring for the home whatever amounts became necessary to pay the taxes and expenses. From 1975 through 1978 the funds necessary to pay real estate taxes and water bills were advanced as gifts from Norman's mother's conservator directly to Norman, apparently in lieu of using monies from his father's trust. Norman did not use the funds to pay the taxes and water bills, and as of November 10, 1977, unpaid taxes and water liens with interest amounted to $8,962.96.

[3] A temporary order was entered on Norman's petition for modification, reducing his support payments to $250 per week beginning October 25, 1974, pending a hearing on the merits.

[4] Despite a twenty-eight month delay between appointment of the master and the filing of his report, the master's progress with the case did not proceed at a snail's pace. The report appears to have been delayed for good reasons up to October 14, 1976, when a motion to reopen the master's hearings for the taking of additional evidence was allowed by the judge, based on asserted changes in Norman's assets because of his mother's death.

assessing approximately $21,800 in arrearages against Norman for unpaid alimony and support and charged him $1,200 as the value of the untransferred mining stock, which by that time had been sold. It was also established before the master and the judge that Norman had failed to pay municipal bills for real estate taxes and water charges on the former marital home.[5] The report was adopted and judgments entered on December 27, 1977, which (a) found Norman in contempt and fixed the arrearages at $28,748.62; (b) reduced Norman's support obligations from $250 to $225 per week; (c) dismissed Benita's petition for modification; and (d) awarded Benita's counsel $13,241.06 attorney's fees and expenses against a requested amount of $32,683.44. The judge subsequently denied Benita's motion to amend the judgments which sought reinstatement of the full level of support, award of the entire amount of counsel fees, and an order requiring the payment of Norman's past due obligations from the assets of a trust established by Norman's father for the benefit of Norman, Benita and the children. Benita has appealed from the denial of that motion for post-judgment relief and from the aforementioned judgments, with the exception of the judgment dismissing her petition for modification. We conclude that it was error to reduce Norman's support below the levels provided in the agreement and that the amount assessed as arrearages should have included the unpaid real estate taxes, the water liens, and the value of the stock. We leave undisturbed the award of attorney's fees and the judge's denial of relief against the trust.

1. *Contempt and modifications.* The issues pertaining to these petitions are before us on a record consisting primarily of the pleadings, a particular portion of the evidence, exhibits and the master's report. That report extensively analyzes

---

[5] The master apparently did not include the unpaid municipal bills as part of the arrearages because he felt that they were beyond the scope of the order of reference, which directed him to determine amounts due under prior orders of court.

the circumstances of the parties and contains all the subsidiary findings underlying its general findings and recommendations.  In such a case we "must take these subsidiary findings together with the inferences that ought to be drawn from them and reach our own conclusions." *Bills* v. *Nunno*, 4 Mass. App. Ct. 279, 283-284 (1976), and cases cited.  Furthermore, since we have everything that was before the judge, all questions of fact, law and discretion are open to review.  *Krokyn* v. *Krokyn*, 378 Mass. 206, 208 (1979).

(a) *Arrearages and support.*  The judge's award of $28,748.62 reflects acceptance of the master's basic findings on the unpaid support between 1974 and 1977, with interest thereon, and acceptance of the master's conclusion that Norman has a present ability to pay the arrearages.  Norman does not challenge either of those conclusions; indeed, our review indicates that they are abundantly supported by the master's subsidiary findings and are correct.

The judge, however, refused to charge Norman with the value of the stock or the amount due on the real estate taxes and water liens, and further reduced his support obligations from $250 to $225 per week.  The basis for the judge's action is unclear,[6] but must presumably find support in a conclusion that Norman had established a change in his or Benita's circumstances, since the date of the original and modified orders, which justified his previous defaults and which could be expected to continue in the future.

Although the power of a Probate Court to modify its judgments in domestic relations cases is "broad and general," *Whitney* v. *Whitney*, 325 Mass. 28, 31 (1949); *O'Brien* v. *O'Brien*, 325 Mass. 573, 576 (1950), it has never-

---

[6] The judge may have felt that the municipal liens were not included within the scope of the prior court orders and therefore not technically part of the arrearages.  We think the incorporation of those portions of the property settlement agreement into the decree that provided for payment of municipal expenses pertaining to the house, and the arrangements made thereafter, whereby Norman obtained the funds necessary to pay the expenses, properly put them before the court as part of the arrearages claimed in Benita's contempt petition.

theless been held "repeatedly . . . that no modification can be made unless the [party seeking a reduction] shows a change of circumstances since the entry of the earlier [judgment] . . . . [T]he basis for this rule is sound. The parties have had their day in court and the issue ought not to be relitigated unless there has been a change of circumstances after the entry of the original [judgment]." *Robbins* v. *Robbins*, 343 Mass. 247, 249 (1961). See also *Hinds* v. *Hinds*, 329 Mass. 190, 191 (1952); *Mead* v. *Mead*, 2 Mass. App. Ct. 338, 340 (1974). The rule applies identically whether modification is considered in the context of a proceeding for modification or is sought in a proceeding for contempt. See *Binder* v. *Binder*, 7 Mass. App. Ct. 751, 754-757 (1979).

The record does not demonstrate a material change in Benita's circumstances sufficient to justify the orders made on the contempt and Norman's modification petition. The 1970 agreement was designed to provide her with a gross annual income of approximately $18,000. The master found that her gross income in 1976 was approximately $16,000 (which included Norman's reduced payments) and that her weekly expenses in 1977 averaged $460, which included the repayment of $7,500 in bank loans at the rate of $71 each week. She held securities which were worth $7,500 at the end of 1976. Other than her interest in the home and its furnishings, she had no other assets of any significance. Certain discretionary payments to her of $600 monthly from the trustee of the marital deduction trust created for the benefit of Norman's mother under his father's will ceased in January, 1976, with the mother's death. The master's finding that these payments and other discretionary payments made by the trustee were supplementary to Norman's obligations imposed by the agreement and court orders, effectively forecloses Norman's argument that the payments were designed to reduce his support. In any event, if Norman had paid all that was due in 1976, Benita's income would have approximated $21,000 which, considering the effect of inflation and the loss of the discre-

tionary trust payments, left her in no better position than she was in in 1971.

Norman predicated his requested relief on three defined changes: (a) his remarriage in 1971; (b) three of his children attaining age eighteen; and (c) claimed business losses. The facts found by the master support his conclusion that Norman's remarriage did not provide a sufficient basis for reducing the outstanding support orders. See *Whitney* v. *Whitney*, 325 Mass. 28, 31 (1949); *O'Brien* v. *O'Brien*, 325 Mass. 573, 576 (1950) ("It may be that because of his second marriage [the husband] will suffer some financial hardship, but the short answer to that is that he must have entered into the second marriage conscious of his obligations to his former wife [and children] so that the second marriage with its attendant obligations affords him no relief," *id.* at 578). The master also correctly concluded that three children reaching age eighteen would not justify reduction in the support orders, because the express terms of the agreement provided for an annual reduction in the support orders as each child reached twenty-one. This provision in the agreement negated the consequences which would flow from the subsequent change in the law establishing an earlier age of emancipation. See clauses Forty-eighth through Fifty-first of G. L. c. 4, § 7, inserted by St. 1973, c. 925, § 1 (effective January 1, 1974), and G. L. c. 231, § 85P, inserted by St. 1975, c. 315, § 1.

Norman's financial position at the time of the divorce revealed that he had annual gross earnings of $31,000 from the family roofing business and approximately $700 yearly in dividends from the stock retained by him under the agreement. His gross income rose to $65,000 in 1971 but returned to $31,000 from 1973 through 1975. The adverse business losses relied upon by Norman were primarily rooted in the decline of the family roofing business, its deterioration after 1973, as the construction industry waned and costs and competition increased, and its liquidation in May, 1976. But after its liquidation, Norman remained in the roofing business under a new and different corporate

name and branched out into several other ventures. The master found that Norman had been receiving "significant income" from his new roofing business and "substantial benefits" (well in excess of what was shown on a tax return indicating $280,000 in gross sales in 1975 with taxable income of $13,000) from a garden shop owned by Norman and managed by his present wife. In 1977 Norman was also the recipient of cash flow rental income from a store in Hyannis, $700 yearly in stock dividends, and $23,000 in annual trust income. It was also found that he would soon receive (as of 1977) substantial income from a shopping center venture to which he had contributed land. On the assets side, the master found that prior to 1977 Norman had received approximately $93,000 from the liquidation of the family roofing business; that his jointly owned residence in Norwell held an equity of $83,000; that Norman's land in Hyannis had been purchased in 1967 for $30,000; and that he owned land in Hingham (valued by the master at $20,000) and land in Duxbury. To this the master added various personal property consisting of a thirty-five foot sailboat (purchased in 1972 for $20,000), stocks valued at $9,740 and a gun collection worth at least $6,000. It was also found that in 1976 an $88,000 net distribution had been made to Norman from his mother's estate; that he received significant annual income from his father's trust; and that he possessed an interest of some size in the trust's principal.

Moreover, the master's task in determining Norman's financial circumstances was rendered more difficult by Norman's intransigence in revealing his assets. The report is replete with references to Norman's failure to produce hard evidence bearing on the financial substance of his assets and business ventures. Illustrative of the difficulties encountered by the master are comments in the report that Norman's "itemization of assets held and of expenses incurred . . . are incomplete and misleading . . .," and that "no evidence was offered [by Norman] to rebut the unrealistic business posture of the garden shop reflected in its tax return." The master was forced to reconstruct asset values from other

sources. We believe that the master could have considered Norman's financial coyness as relevant to the over-all situation, especially because Norman, as the proponent of change in the status quo, was the one who bore the burden of establishing altered circumstances. Giving full effect to the business losses suffered by Norman prior to 1976, there is no evidence of any material decline in his earnings and considerable evidence of a substantial increase in his assets after the decree was entered. On the record before us, it cannot be found that Norman should have been excused from paying what was required to discharge the municipal liens and the amount representing the value of the stock, or that any change of circumstances had occurred (other than those already anticipated by the agreement) which would permit reduction of the support and alimony orders established by the 1971 decree.

(b) *Attorney's fees.* Benita's counsel, in accordance with the provisions of G. L. c. 208, § 38, as appearing in St. 1933, c. 288, moved for payment of $29,415 in attorney's fees and $3,268.44 in disbursements for his work on the various proceedings. The judge allowed $13,241.06 undivided between counsel fees and expenses. Benita claims that the judge erred and that we should increase the amount to the full level sought.

The award, of course, is not to be changed unless an abuse of discretion on the judge's part is evident from a demonstration that the amount set is clearly incommensurate with an objective evaluation of the services performed. See *Hayden* v. *Hayden*, 326 Mass. 587 (1950). Cf. *Smith* v. *Smith*, 361 Mass. 733 (1972). Cases on this subject indicate that awards in domestic relations litigation are to be governed by caution and restraint, for "[f]ees in such cases are awarded on 'strictly conservative principles.'" *Hayden* v. *Hayden*, *supra* at 596, quoting from *Commissioner of Banks, petitioner,* 240 Mass. 478, 485 (1922). See also *Sack* v. *Sack*, 328 Mass. 600, 606 (1952). Benita argues that it is time to abandon any prevailing penurious attitude as to these awards, and she claims that later cases may have

drawn away from earlier cautionary restraints. See *Madden* v. *Madden*, 363 Mass. 884 (1973); *Hano* v. *Hano*, 5 Mass. App. Ct. 639, 641-642 (1977).

The number of judgmental variables in an award of counsel fees is considerable. Some of the standards are set forth in the cases. See for example *Cummings* v. *National Shawmut Bank*, 284 Mass. 563, 569 (1933); *Perkins* v. *Blake*, 3 Mass. App. Ct. 415, 418 (1975). See also *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 629-630 (1978) (award assessed against a party having no contractual relationship with the attorney involved depends not on what the attorney usually charges, but on the objective worth of the services). Other standards are set forth in rules (see S.J.C. Rule 3:22, DR-2-106[B], 359 Mass. 807-808 [1972]), or discussed in compilations. See Anno. 57 A.L.R. 3d 475 (1974) (assembling cases on the amount of attorney's compensation in the absence of a contract or statute fixing the amount). All factors found relevant must be applied in the setting of a domestic relations litigation, where some prudence is required. Because the decision of the probate judge involves an exercise of judgment in the application of the variables, it will be entitled to a large measure of respect on review.

In the present case, we have carefully examined the statements of charges prepared by Benita's counsel. They reveal slightly in excess of seventy-three hours of "courttime," and approximately 280 hours of time spent in research, preparation, discussions between counsel and status reports to the client. There is some duplication of time; the hourly rates charged might be considered to be slightly in excess of generally prevailing norms. On balance, the issues pursued were commonplace in disputes of this character. The pursuit of the trust proved quixotic below, although, as will be discussed later, a measure of success was ultimately achieved on the point. Benita is not totally destitute, and she has some ability to pay a portion of the unawarded bill. The members of the present panel, had they severally sat on the matter below, might well have differed in the amounts

they would have allowed; but we are unanimous in concluding that the award made and objected to was within the range of reasonable discretion. Over-all, in affirming the award, we do not intend to detract one iota from the diligent and effective work performed by Benita's industrious counsel or to suggest that any of the charges are not advanced in good faith. Nor are we sanctioning a miserly attitude. Instead, we again stress the delicacy of these awards, the role of the judge's discretion in their consideration, and the fact that each such award is to be carefully screened on its own merits.

2. *Remedy against the trust.* Norman has appealed from orders by a single justice of this court which required satisfaction of the judgments for the arrearages and the attorney's fees and expenses out of the assets of his father's trust (the Norman B. Pemberton Trust, hereafter the trust). In substance the orders compelled the trustee, the South Shore Bank (bank), despite a spendthrift clause in the trust and the grant of discretion to the bank as to disbursement of principal, to advance or lend Norman from the trust's principal the amounts necessary to satisfy the judgments and required Norman to take certain action to repay the advances or loans.[7] The orders also amended the judgment entered on Norman's modification petition to require the bank to pay Benita future support and alimony out of the trust's income which would otherwise be payable to Norman. These orders have ongoing force, and are not mooted as to Norman by the bank's present position hereafter described.

---

[7] Norman was ordered to execute a demand note payable to the trust to repay the loans. The note was to be secured by a mortgage on certain Massachusetts real estate. If Norman did not execute the note and mortgage by October 8, 1978, the bank was given a mortgage lien on all his real estate in Massachusetts, including certain interests held by him in a real estate trust. If the loans were not repaid within one year, the bank was authorized but not required to reimburse itself from the trust income at a specified monthly rate. Finally, the loans and payments ordered to be made were without interest for a one-year period. Thereafter the bank could charge eight per cent annual interest on any amount which should remain unpaid.

They are discussed in a separate opinion released today (*post* at 809) and will be reversed.

Benita has appealed from the refusal by the Probate Court to grant relief against the trust similar to that ultimately ordered by the single justice.[8]  The trust in question was created by Norman's father by an agreement and declaration of trust dated June 27, 1944, and was subsequently modified by the father's exercise of a reserved power of amendment on July 16, 1969.  The trust provided that after the death of the survivor of Norman's father and mother (his mother survived, later dying in 1976) it would continue for the benefit of Norman, Benita and their children.  Four of its provisions are pertinent to the issues before us:  (a) Benita is not to receive any income from the trust if she is not Norman's wife; (b) the net income generated by the trust is to be paid to or on behalf of Norman, or, in the trustee's discretion, for the benefit of the children; (c) the bank in its discretion may expend principal for the benefit of either Norman or the children; and (d) the respective interests of all the beneficiaries are subject to a so called spendthrift restraint.[9]  Despite the discretionary powers accorded to the bank and the spendthrift provision, Benita argues that it was error for the several probate judges to refuse to order the bank to expend trust assets and income to satisfy the judgments and continuing support orders.

Trusts containing spendthrift provisions of the type under consideration in this case are recognized as valid in Massa-

---

[8] Three probate judges apparently considered her request and denied it. The judge who dealt with the master's report and the various petitions denied the requested relief on January 26, 1978, by denying that part of the motion to amend the judgments.  A second judge on March 9, 1978, allowed the relief and entered a judgment ordering the bank to make the payments but on April 13, 1978, vacated the judgment.  A third judge, also on April 13, 1978, refused to alter the orders previously made denying relief.

[9] "The respective interests of the beneficiaries in the income and principal of the trusts herein created shall not be anticipated or assigned, shall be free from any control or interference of creditors or others, and shall not be subject to attachment or any other process, legal or equitable, nor to bankruptcy or insolvency proceedings."

chusetts. *Broadway Natl. Bank* v. *Adams,* 133 Mass. 170 (1882). "The path of the wife seeking recovery from her husband's trust interest for alimony or support of children is more difficult in Massachusetts . . . [i]t has been held that she can recover neither as a judgment creditor (*Bucknam* v. *Bucknam,* 294 Mass. 214 [1936]) nor in a suit to require the trustee to pay reasonable sums from the trust income for the support of legal dependents of the beneficiary. *Burrage* v. *Bucknam,* 301 Mass. 235 (1938)." Griswold, Spendthrift Trusts § 191.1 (2d ed. 1947). Moreover, in Massachusetts the settlor's intent to deny creditors of a beneficiary recovery against trust assets or recovery against the trustee's wishes has been accorded particular deference, even in the face of strong public policy arguments favoring such a recovery. See *Randolph* v. *Roberts,* 346 Mass. 578 (1964), where the plaintiff town could not reach and apply the principal of a spendthrift trust to reimburse itself for the beneficiary's welfare disability charges. Furthermore, if even apart from the spendthrift clause a trustee is given the discretionary power to distribute income or principal to described beneficiaries "[a]*ny* right of *any* beneficiary to receive *anything* is subject to the condition precedent of the trustee having first exercised his discretion. The immunization of the trust assets from the reach of creditors of the beneficiary is complete." Powell, Freedom of Alienation — For Whom? The Clash of Theories, 2 Real Property, Probate & Trust L.J. 127, 128-129 (1967) (emphasis in original). See also *Spalding* v. *Spalding,* 356 Mass. 729 (1969) ("The power lodged in the trustee to invade principal 'in its uncontrolled discretion' for the maintenance, support and education of [the minor child] does not give to [the child and his mother] an enforceable claim against the trust for their support"). There is some authority that favors a policy exception to permit a former wife and the dependents of a beneficiary the right to pierce a spendthrift clause,[10] and

---

[10] The limited authority permitting recovery to a wife and dependents against a spendthrift clause is collected and discussed by Professor Powell

some meager authority exists in favor of compelling a trustee to exercise his discretion to make support payments from a trust.[11]  However, we need not comment further on the subject because in the present case the bank, subsequent to the entry of the single justice's orders, took the position that, based on its interpretation of relevant trust provisions in the light of the case law, it would not appeal from the orders made by the single justice and that it would exercise its discretionary powers to satisfy the judgments and to pay future support out of the trust.  In so doing, it undoubtedly had in mind the fact that the children were expressly designated by the settlor as beneficiaries of its discretion and that any sums expended would directly or indirectly flow to the ultimate benefit of the children by promoting their "proper education, care, comfort, or support."  In view of this, it is unnecessary to pass on the propriety of the bank's reliance on the single justice's orders because it is clear that by not appealing the orders the bank has made a separate and independent determination to act pursuant to the discretionary powers conferred on it by the settlor.  The bank's approach in paying the support orders from the trust assets is characterized in its brief as "not contrary to [the bank's understanding of the case law] . . . with respect to interpretation of the Trust, especially the spendthrift provisions, and with respect to its discretionary authority.  It is, instead, a realis-

---

at 2 Real Property, Probate & Trust L.J., *supra* at 137-138, by Professor Wicker in an article, Spendthrift Trusts, 10 Gonz. L. Rev. 1 (1974), and by Professor Bogert, Trusts and Trustees § 224 (rev. 2d ed. 1977).  See also Restatement (Second) of Trusts § 157, cl.(a) (1957), which favors special treatment of claims by a wife and dependents despite a spendthrift clause, 2 Scott, Trusts § 157.1 (3d ed. 1967), and cases cited.

[11] Where, as in this case, the trustees are given discretion as to the distribution of income and principal to the children, there is little authority which allows a court to control the trust so as to permit assets to be reached over the objection of the trustee.  See *Greenwich Trust Co.* v. *Tyson,* 129 Conn. 211 (1942); *Constanza* v. *Verona,* 48 N.J. Super. 355 (1958).  Of course, in the present case, the provisions of the trust are quite explicit that Benita is not to receive anything from the trustee if she is not Norman's wife.

tic exercise of [that] discretion." [12] The actions of the several probate judges in denying relief against the trust by way of affirmative orders directed to the bank are correct because of our case law, the trust's language, and the implied conclusion on the part of the judge who dealt with the bulk of the litigation that other remedies and other assets (including Massachusetts real estate) were available to compel Norman, if it became necessary, to comply with his obligations.

3. *Disposition.* The judgment pertaining to the award of attorney's fees and expenses is affirmed. So much of the order denying the motion seeking postjudgment relief against the trust is affirmed. Since the levels of support should not have been reduced below those specified in the agreement, and since the arrearages were erroneously determined, the contempt and modification judgments and the orders denying postjudgment relief with regard thereto are reversed. The contempt and modification cases are remanded for further proceedings consistent with this opinion, which shall include (a) recomputation of support arrearages due as of December 27, 1977, with interest thereon; and (b) the addition of unpaid municipal expenses (real estate taxes and water liens) with interest as of December 27, 1977, and the value of the Park Mining Company stock with interest. The proceedings may, in the discretion of the Probate Court, include the taking of testimony to determine whether Norman's petition for modification is supported by changes in the circumstances of the parties which have occurred since December 27, 1977. The court may, in its discretion, reopen the contempt proceedings for the additional purpose of computing arrearages to the present.

*So ordered.*

---

[12] Benita apparently agrees that the bank's present exercise of its discretion to favor her and the children with payments does act to discharge Norman's support obligations.