SCOTT O. GERSHAW, trustee,[1] vs. BURTON C. GERSHFIELD.

No. 98-P-1410.

Essex. December 11, 2000. - July 13, 2001.

Present: BROWN, GILLERMAN, & DUFFLY, JJ.

*Judge. Conflict of Interest. Trust,* Construction, Settlor, Termination, Assets of trust, Trustee's accounts, Trustee's discretion. *Probate Court,* Guardian ad litem.

There was no merit to the claim by the defendant in a civil action that the judge's failure earlier to recognize a possible conflict of interest warranted a conclusion that the judge was not impartial. [85]

Nothing in a probate judge's findings of primary facts, the language of a trust, or the uncontested evidence supported the judge's ultimate finding that "the donor's apparent intent was that his son and grandchildren should benefit equally from his generosity," but, rather, based on express language in the trust instrument, the subsidiary findings and uncontested evidence, it was apparent to this court that the donor's dominant purpose was to provide for his son's lifetime support and housing needs, and that the trustees' discretionary power also to make distributions for the support and education of the grandchildren was to be exercised in light of the priority claim [86-87]; consequently, this court vacated the Probate Court judgment insofar as it instructed the trustees to divide certain trust assets and income equally between the son and his two children [87-89], to divide the son's share into three separate trusts [89], and to terminate the trust upon distribution to the son of his share of assets [89-90].

A probate judge erred in instructing the trustees of a trust to distribute to the donor's daughter and her husband the sum of $23,500 out of her brother's share of the trust in accordance with an agreement between the brother and sister obligating the brother to his sister and her husband for certain financial support provided the brother's children, where the payment determined to be due was not based on a preexisting court order for child support, and there was no evidence as to the basis for the figure set forth; and where the trust precluded voluntary or involuntary alienation of the brother's interests for the payment of creditors and claims. [90-92]

Absent findings setting forth the basis for dismissal of a trust beneficiary's counterclaim, in an action by the trustee of the trust for instructions, which alleged, among other things, a failure on the part of the trustee to provide information regarding "the receipt of assets from the Executrix of the Estate," specifically, certain bank accounts held jointly by the donor and

[1]Of the Samuel Gershfield Family Trust of 1987.

the executor, this court remanded the case for further proceedings on the issue whether the bank accounts should have been included in the inventory of the donor's trust estate. [92-94]

A probate judge's ultimate finding, based on his subsidiary findings, that a trustee's plan to sell certain real property and to make provision out of the proceeds for a beneficiary's maintenance as well as the educational needs of the beneficiary's children constituted a reasonable exercise of his discretionary authority under the trust was not plainly wrong. [94-95]

There was no abuse of discretion in a probate judge's denial of a trust beneficiary's request that a guardian ad litem be appointed to represent his interests but, where the question was close, this court encouraged the probate judge to review the need for the appointment of a guardian ad litem. [95-97]

This court vacated so much of a Probate Court judgment that instructed trustees to pay ninety per cent of a trustee's fees and costs out of one beneficiary's share of the trust estate and remanded for reconsideration the issue of apportionment of fees and costs, as well as the trustees' accounting forming the basis of a distribution of trust assets between the beneficiaries. [97]


CIVIL ACTION commenced in the Essex Division of the Probate and Family Court Department on December 23, 1996.

The case was heard by *John C. Stevens, III*, J.

*Marcy Richmond* (*Robert J. O'Regan* with her) for the plaintiff.

*Burton C. Gershfield*, pro se, submitted a brief.

DUFFLY, J. Burton C. Gershfield appeals from a decree entered in the Probate and Family Court on a complaint for instructions brought by Scott O. Gershaw, as trustee of the Samuel Gershfield Family Trust of 1987 (trust), and from the dismissal of his counterclaim. We decide that the judge's modification of the trust terms in several material respects constituted error of law and that the counterclaim should not have been summarily dismissed. Accordingly, we vacate the judgment and remand for further hearing and entry of orders consistent with this opinion.

The complaint for instructions was filed in the following context. Samuel Gershfield died on January 11, 1996, his wife having predeceased him. On Samuel's death the bulk of his estate was to fund the trust, the assets of which were to be divided equally between two of his children, Cynthia Title-

baum[2] and Burton C. Gershfield. Cynthia's share was to be distributed to her free and clear of trust, while Burton's share was to remain in trust to provide support and housing for his lifetime. In a subsequent amendment of the trust, Burton's children Ace and Julie[3] were included as beneficiaries of that portion of the trust initially set aside solely for Burton's benefit, their interests to terminate as each reached age twenty-five. As alleged in the complaint, the trustees[4] determined that the trust share that had been set aside for Burton and his children had insufficient resources to make all the distributions contemplated by Samuel. The trustees therefore sought, among other things,[5] instruction with respect to the priority of distributions among the three named trust beneficiaries, stating that "the cotrustees . . . established the following priorities for distribution of that portion of the Trust," as follows:

"1. Mr. Burton Gershfield's shelter;
2. Medical needs of Mr. Burton Gershfield's children;
3. Support of Mr. Burton Gershfield's minor children;

---

[2]Cynthia Titlebaum was named executrix of her father's will. Her husband, Ronald B. Titlebaum, is a cotrustee of the trust but did not join in the complaint. Both Cynthia and Ronald testified at trial, along with Gershaw, in support of Gershaw's position.

[3]Ace Heart Gershfield (Ace), born September 29, 1979, and Lumina Infinite Gershfield, a/k/a Julie Pink Rose Gershfield (Julie), born March 12, 1978, are the children of Burton and of Anya Gershfield, his wife at the time of trial. Burton had been previously married to another woman. Burton's eldest child, Jesse Chance Gershfield, also a beneficiary, had, prior to trial, reached age twenty-five, and his interests are not implicated in this dispute.

[4]Although the complaint for instructions was filed only by Gershaw, numerous allegations refer to acts of the "trustees." At trial, Ronald testified that there were no "decisions of any consequence" that were made by Gershaw absent prior consultation with Ronald.

[5]The complaint also sought instructions approving an unequal allocation of fees and expenses between Cynthia's share of the trust and Burton's share; an assessment of a monthly rent from Burton while he resides in the property held by the trust, located at 126 Nichols Street, Everett, and the allocation to Cynthia's share of one-half of the value of these rents; the transfer of Cynthia's half interest in 126 Nichols Street to Burton's trust share in exchange for funds of equal value in Burton's share; and the payment, out of Burton's share, of amounts allegedly due to Cynthia and Ronald for their past support of Burton's children Ace and Julie.

4. Education of Mr. Burton Gershfield's children;

5. Mr. Burton Gershfield's medical needs;

6. Welfare of Mr. Burton Gershfield's children; and

7. Mr. Burton Gershfield's welfare."

At trial, the trustee argued that the claims of the beneficiaries should be treated equally; that Burton's share should be divided into three equal trusts, each for the individual benefit of Burton, Ace, and Julie; and that final distributions should be made and the trust terminated.

Following trial, the probate judge issued findings and a "decree," more appropriately termed a judgment.[6] In addition to dismissing Burton's counterclaim, the judgment provides that the trust share for the benefit of Burton and his children bear ninety per cent of the $47,000 allowed for Gershaw's services as cotrustee, plus ninety per cent of expenses; that $23,500 be paid out of Burton's share to Cynthia and Ronald for support arrears found to be owed them by Burton; and that the trust premises, located at 126 Nichols Street (premises), be sold "forthwith."[7] The judgment further provides that Cynthia's share shall be determined "as of the date of the death of . . . Samuel Gershfield, plus earnings"; that "[f]or the purposes of calculating beneficial interests, the value of [the premises] and all costs of maint[enance] . . . shall be allocated to . . . [Burton's] share of the trust . . . [and that] [v]aluation of this distribution shall be determined as of the time of the distribution[]." The judgment also specifies that, after payment of fees and expenses of sale and as provided in the judgment, the remaining funds in Burton's share were to be allocated

---

[6]Mass.R.Civ.P. 58, 371 Mass. 908 (1977). The Reporters' Notes to Mass.R. Civ.P. 58, Mass. Gen. Laws Ann., Rules of Civil Procedure at 99 (West 1992), provide, in pertinent part, that: "Rule 58 effects a major change in Massachusetts practice. Under the previous separate procedural systems for actions at law and suits in equity, a 'judgment' was a final decision at law while a 'decree' was the terminal document in a suit in equity. With the adoption of Rule 2, both situations are covered by the one term: Judgment." The rules of civil procedure apply in the "Probate and Family Court in proceedings seeking equitable relief." Mass.R.Civ.P. 1, as amended, 423 Mass. 1404 (1996).

[7]Burton had been residing in an apartment on the premises pursuant to the terms of the trust. See note 13, *infra*.

equally between Burton, Ace, and Julie, with one-third set aside for Burton's housing needs until exhausted and the remaining two-thirds divided equally between Ace and Julie for their college education and related costs. Gershaw was removed as trustee, but not due to any "impropriety or failure to perform his duties," and Ronald was to remain as sole trustee.[8]

Burton's claims on appeal are that (1) the probate judge abused his discretion and committed error of law; (2) certain of the assets of his father's estate were distributed to Cynthia that should have been included in the trust corpus; (3) the fiduciaries engaged in fraud and misrepresentation; (4) the probate judge's denial of Burton's request to have a guardian ad litem appointed to represent his interests at trial was an abuse of discretion; and (5) the trial judge's recusal, following the entry of the decree, on the basis of the appearance of conflict of interest, raises due process concerns.[9]

At the outset, we conclude that there is no basis for Burton's claim that the trial judge's failure earlier to recognize a possible conflict of interest warrants a conclusion that the judge was not impartial. The judge stated that he was unaware of the potential conflict until he had rendered his decision. See *Miles* v. *Caples*, 362 Mass. 107, 111 (1972).

We proceed to a discussion of the remaining issues, summarizing certain background facts as set forth in the trial judge's findings, supplemented where appropriate by undisputed facts in the record.

Burton's relationship with his father was, for most of his life, not a close one. In 1965, Burton moved to California where, after initial modest success in the film industry, Burton fell on hard times. Cynthia remained in Massachusetts and married

---

[8]The trust provides that "[i]n the event of the death, resignation or removal of a successor Co-Trustee, then the remaining Co-Trustee shall serve as sole Trustee and shall have the powers to appoint his successor. . . ." In the circumstances of this case, it may be prudent for the probate judge to consider the appointment of a successor to Gershaw.

[9]We have distilled the essence of these claims from Burton's brief in conjunction with a review of Burton's counterclaim, his oral argument at trial, and the parties' joint pretrial memorandum. A pro se litigant on appeal, Burton did not participate in the oral argument. See *McLeod's Case*, 389 Mass. 431, 434 (1983).

Ronald Titlebaum. As Burton's financial and personal life grew increasingly unstable, his family provided financial assistance, and Cynthia and Ronald provided periodic care and support to Ace and Julie. In January, 1980, when Ace was three months old and Julie approximately one year old, Burton and Anya sent the children from California to stay with the Titlebaums in Massachusetts. Ace remained one year and Julie eight months before returning to their parents. The children subsequently stayed with the Titlebaums for varying periods of time between 1981 and 1983; following that, they were in foster care. As a result of Burton's problems he also lived with Cynthia and Ronald for approximately a year and one-half during the mid-1980's.

In August, 1993, Ace came to live with the Titlebaums in what was to be a permanent arrangement. Julie also lived with the Titlebaums for six or seven months during 1994, but returned to live with her foster family. At the time of trial, she was attending college in California and living in her own apartment. The financial support provided to Ace and Julie by the Titlebaums was, for the most part, without contribution from Burton or Anya.

Samuel Gershfield's will, executed on July 22, 1987, provided that, except for furniture, automobiles, and other items of domestic use which were to be divided between Cynthia and Burton, his estate was to be held and administered pursuant to the terms of the trust executed that same date. In pertinent part, after setting aside $5,000 in trust for each of Samuel's grandchildren (Ace and Julie, initially excluded, were added by later amendment), the trust assets were to be divided equally between Cynthia and Burton. Burton's share was to be held in trust for his lifetime, with his children the remaindermen, and was subject to a spendthrift clause. The trust was subsequently amended to make provision for Ace and Julie, and it is the language of this amendment that gives rise to much of the controversy.

1. *Interpretation of donor's intent.* "The interpretation of a written trust is a matter of law to be resolved by the court. . . . A trust should be construed 'to give effect to the intention of the settlor as ascertained from the language of the whole instru-

ment considered in the light of the attendant circumstances.' " *Schroeder* v. *Danielson*, 37 Mass. App. Ct. 450, 453 (1994), quoting from *Harrison* v. *Marcus*, 396 Mass. 424, 429 (1985).

We find nothing in the probate judge's findings of primary facts, the language of the trust, or the uncontested evidence to support the probate judge's ultimate finding that "the donor's apparent intent was that his son and grandchildren should benefit roughly equally from his generosity." Rather, based on express language in the trust instrument, the subsidiary findings, and uncontested evidence, it is apparent that Samuel's (the donor's) dominant purpose was to provide for Burton's lifetime support and housing needs and that the trustees' discretionary power also to make distributions for Ace's and Julie's support and education was to be exercised in light of this priority claim.

a. *Equal treatment of beneficiaries.* The probate judge's findings establish that the donor was aware that Burton would require housing and financial assistance during his lifetime, and would not be able to provide his children with support and education.[10,11] That the donor's dominant intent was to provide for Burton's support and housing needs is manifest in the express language of several provisions of the trust. Article Four, section (2), paragraph two provides[12]:

"The Trustees shall hold the share for BURTON C.

[10]The probate judge found that "the donor was aware of Burton's financial and personal problems at the time he executed the trust and subsequent amendments," and that "the donor was aware of Burton's failure to provide for Ace and Julie, and that he increasingly became resigned to the fact that he would have to give some measure of support to his grandchildren through the trust."

[11]There was evidence at trial that the donor established Uniform Transfers to Minors Act (UTMA) accounts for his grandchildren that needed to be spent down before Gershaw would agree to reimburse Ace or Julie for expenses related to their education. Julie received the balance in her UTMA account, about $6,000, when she reached age eighteen. In addition, the donor's specific bequests to the grandchildren in the amount of $5,000 had, by the time of trial, appreciated to a value of $10,547. This evidence indicates that the donor was mindful of the children's educational needs and made separate provision for those needs.

[12]The original paragraph two provided that "[d]uring [Burton's] lifetime the Trustees shall pay or apply so much of the principal and income as the Trustees in their sole discretion shall deem advisable to provide for [Burton's] proper maintenance, medical needs, health and support." This provision was amended a second time on May 12, 1994, following a failed attempt by Cynthia and

GERSHFIELD in Trust for his benefit and the benefit of the issue of BURTON C. GERSHFIELD under the age of twenty-five (25) who are living or such one or more of them as the Trustees may in the Trustee's [*sic*] sole discretion determine — it being the Donor's intention that the Trustees shall have the right at any time or from time to time to exclude any or all of the issue of BURTON C. GERSHFIELD and to make unequal distributions among them. It is the Donor's desire however, that the income and principal of the share for BURTON C. GERSHFIELD be used primarily for the comfortable support and maintenance of BURTON C. GERSHFIELD during his lifetime, this expression of desire is to be considered as merely a guide to the Trustees and not as a binding obligation of the Trust. Upon an issue of BURTON C. GERSH-FIELD attaining age twenty-five (25) such child shall no longer be entitled to share in the distributions under this second paragraph of Section (2) ARTICLE FOUR. During the lifetime of BURTON C. GERSHFIELD and until his then living issue attain age twenty-five (25), the Trustees shall pay or apply so much of the principal and income as the Trustees in their sole discretion deem advisable to provide for BURTON C. GERSHFIELD'S proper care, maintenance, medical needs, health, support, education and emergency needs and that of his issue under the age of twenty-five . . . ."

The provision that "[i]t is the Donor's desire . . . that the income and principal of the share for [Burton] be used *primarily for*" (emphasis added) Burton's lifetime support emphatically sets forth the donor's intent that Burton's needs receive priority over the needs of Ace and Julie. That the provision also states that this expression of the donor's desire was to be "merely a guide" cannot reasonably be interpreted to require the trustees to treat Burton's needs as equal to those of Ace and Julie.

Moreover, the trustees are directed to provide for Burton's "comfortable support and maintenance . . . during his

Ronald to have Burton sign an agreement that his trust share could be used to provide support and education for Ace and Julie.

lifetime," and, if needed, to provide him with a place to live.[13] In comparison, the directions to the trustees regarding distributions to Ace and Julie are limited in duration and give the trustees the authority to exclude Ace and Julie entirely.

The donor gave no indication, by the use of expressions such as "in equal shares," or "share and share alike," that Burton, Ace, and Julie should share equally in the trust proceeds. Such an interpretation "would require us to read into the instrument a provision that is not there." *New England Merchs. Natl. Bank* v. *Morin*, 16 Mass. App. Ct. 104, 108 (1983).

The trustees are obligated to fulfill their duty to the trust by exercising their considerable discretion when making distributions in light of the donor's enunciated priorities. The trustees are to find guidance in the donor's stated intent to provide "primarily" for Burton's support, and must look, for a determination of the donor's priorities, to the trust instrument as a whole. See *Walker* v. *Walker*, 433 Mass. 581, 587 (2001).

The finding that the donor's intent was to divide the resources of Burton's share of the trust equally between Burton, Ace, and Julie was error, and the instruction directing that the trust income and assets be allocated equally between them must be set aside.

b. *Creation of three separate trusts.* We likewise find nothing in the language of the trust to support the creation of three separate trusts benefiting Burton, Ace, and Julie. "The law of Massachusetts is plain that a valid trust, once created, cannot be revoked or altered except by the exercise of a reserved power to do so, which must be exercised in strict conformity to its terms." *Phelps* v. *State St. Trust Co.*, 330 Mass. 511, 512 (1953). See also 4 Scott, Trusts §§ 330.1, 330.8 (Fratcher 4th ed. 1989); Loring, A Trustee's Handbook § 8.2.2 (Rounds ed. 2001).

c. *Termination of the trust.* The trust, by its terms, was to continue for Burton's lifetime, and upon his death any remainder

---

[13]At paragraph three of Article Four, section (2), the trust provides: "Furthermore, in the event that BURTON C. GERSHFIELD is in need of a place to live, the Trustees are directed to provide him with an apartment at 126 Nichols Street, Everett, Massachusetts. In the event that 126 Nichols Street has been sold, [or] if an apartment is not available, then the Trustees are directed to provide BURTON C. GERSHFIELD with a place to live, which accommodations are comparable to those at 126 Nichols Street."

was to be held in trust for Burton's children until they reached the age of twenty-five. "[I]t is settled that where the testator has fixed the time for the termination of the trust, and where it is active and its purposes and objects have not been fully accomplished and its termination would not best accomplish the testator's intent, the trust cannot be terminated. . . ." *Allen* v. *First Natl. Bank & Trust Co.*, 319 Mass. 693, 695-696 (1946), quoting from *Whitney* v. *Whitney*, 317 Mass. 253, 257 (1944). 3 Newhall, Settlement of Estates and Fiduciary Law in Massachusetts § 36:33 (Belknap 5th ed. 1998).

The trustees had a duty to fulfill the donor's clearly expressed intention that Burton receive lifetime support and housing, if needed, and could not terminate the trust until its purposes had been fulfilled. The probate judge found that Burton was incapable of supporting himself.[14] " 'Prudence and reasonableness, not caprice or careless good nature, much less a desire on the part of the trustee to be relieved from trouble or from the possibility of making a foolish investment, furnish the standard of conduct.' . . . The trust must continue during the life of [the lifetime beneficiary], except as the exercise of the power may prevent." *Boyden* v. *Stevens*, 285 Mass. 176, 179-180 (1934), quoting from *Corkery* v. *Dorsey*, 223 Mass. 97, 101 (1916).

In light of the foregoing and our earlier determination that the trust does not permit the principal and income to be divided equally between Burton, Ace, and Julie, we conclude that it was error to instruct the trustees to set aside one-third of the balance of trust proceeds for Burton "until such portion of the trust is exhausted for Burton's reasonable expenses for shelter in an apartment comparable to the accommodations at the premises."

2. *Other issues.* a. *Distribution for child support arrears.* The probate judge found that a 1994 agreement between Burton and the Titlebaums established that Burton was obligated to Cynthia

---

[14]As reflected in the findings, "Burton is presently incapable of supporting himself. Despite his education and evident native intelligence, Burton's long history of mental instability (including a ten-day psychiatric hospitalization), dysfunctional relationships, and drug abuse clearly indicates that his inability to do so will likely continue." The evidence at trial was that Burton, who had at points in his life been homeless, is in need of lifetime support and housing. Burton has been determined to be disabled by the Social Security Administration and receives disability benefits.

and Ronald for their financial support to Ace and Julie and that, as "calculated by the trustees," the amount due them was $42,000.[15] The probate judge determined that, due to the insufficiency of the fund to pay the full amount, the payment should be $23,500. He found that, "[a]s agreed to by the parties," the Titlebaums were entitled to be paid from Burton's share of the trust.

The payment determined to be due Ronald and Cynthia was not based on a preexisting court order for child support.[16] There was also no evidence as to the basis for the $900 per month figure set forth in the document. Had a court established a current support obligation, it would have done so pursuant to applicable child support guidelines taking into account Burton's income and ability to pay, as well as the needs of his children. Even assuming that the evidence supports a finding that Burton consented to pay Cynthia and Ronald the sum of $42,000 out of his share of the trust, the distribution should not, in the circumstances of this case, have been made. The trust precludes voluntary or involuntary alienation of Burton's interests for the payment of creditors and claims.[17] "Trusts containing spendthrift provisions of the type under consideration in this case are recognized as valid in Massachusetts," *Pemberton* v. *Pemberton*, 9 Mass. App. Ct. 9, 19-20 (1980), and the trustee cannot assign to a creditor the beneficial interest of a beneficiary, even

---

[15]The document admitted in evidence provides in relevant part that "Burton is to be responsible for the children's cost of maintenance in the amount of Nine Hundred Dollars ($900.00) per month. These monies are due [to the Titlebaums] when Burton is financially capable of paying same or from his share of his inheritance from his father, if any."

[16]We have the added concern about this payment that the amount "due" was fixed by Ronald, a cotrustee, and that it was being paid to him and to Cynthia, the executrix of the donor's estate. There consequently should have been some basis offered for the trustees' figures, particularly in view of the fact that Julie did not reside with the Titlebaums for all but a few months of the relevant period, and that for a portion of this time Ace was in college, and some of his room and board expenses might have been met by other sources.

[17]At art. four, § (7), the trust provides as follows: "*Trust to be Free of Creditors.* To the extent allowed by law, the interest of any beneficiary in this Trust whether income or principal, shall not be subject to claims of his or her creditors, claimants or others, nor to legal process, and may not be voluntarily or involuntarily alienated, disposed, hypothecated or encumbered."

at the direction of the beneficiary. The trustee is not an agent of the beneficiary. Loring, A Trustee's Handbook § 6.1.2 (Rounds ed. 2001).[18] Neither can a court enforce such a claim by creditors. *Pemberton* v. *Pemberton*, 9 Mass. App. Ct. at 20. Here, the debt due Cynthia and Ronald was one subject to provisions in the trust precluding alienation of trust assets for the claims of creditors.

We therefore set aside so much of the judgment as instructs the trustees to distribute to Cynthia and Ronald the sum of $23,500 out of Burton's share of the trust.

b. *Inventory and accounting of trust assets.* There were no findings setting forth the basis for the dismissal of Burton's counterclaim which alleged, among other things, a failure on the part of the trustee to provide information regarding "the receipt of assets from the Executrix of the Estate Of Samuel Gershfield," and demanded an accounting and removal of the trustee.

The trial judge found that, at the time of his death, the donor had approximately $711,000 in assets held individually and jointly with Cynthia. Of this $711,000, three bank accounts with a combined account value of $133,556 "passed to Cynthia directly as jointly held property" in addition to life insurance

---

[18]Restatement (Third) of Trusts c. 12 § 59 (Tent. Draft No. 2, 1999) would expressly exempt enforceable claims against the beneficiary for "support of a child, spouse, or former spouse" from the purview of a spendthrift trust. This issue has not recently been visited by our courts. Over twenty years ago, in *Pemberton* v. *Pemberton*, 9 Mass. App. Ct. at 20, quoting from Griswold, Spendthrift Trusts § 191.1 (2d ed. 1947), this court noted that "[t]he path of the wife seeking recovery from her husband's trust interest for alimony or support of children is more difficult in Massachusetts . . . . [I]t has been held that she can recover neither as a judgment creditor . . . nor in a suit to require the trustee to pay reasonable sums from the trust income for the support of legal dependents of the beneficiary." Notwithstanding this articulation of the law, we noted the existence of "some authority that favors a policy exception to permit a former wife and the dependents of a beneficiary the right to pierce a spendthrift trust." *Ibid.* Our holding that it was error to distribute to Cynthia and Ronald from Burton's share of the trust an amount reflecting a debt due them for the past support of his children is limited to the particular circumstances of this case. We do not decide whether a parent or legal guardian may, in appropriate circumstances, obtain a court order requiring that child support be paid from a trust that is subject to a spendthrift clause.

proceeds[19] and personal property, and other moneys "paid as taxes or debts of the estate."[20] The trust corpus subject to division between Burton and Cynthia was found by the judge to have a value at the donor's death of about $440,000, and included the premises located at 126 Nichols Street, a four-unit apartment building that was valued at $140,000. The sole evidence concerning the donor's intent with respect to the joint bank accounts was Cynthia's testimony that she was unaware of the existence of these joint accounts until after her father's death and that he had created other joint accounts during his lifetime from which he had removed her name. Gershaw's stated belief that the joint accounts "pass[ed] outside of probate and are not part of a will and a trust" was not determinative.

Whether the joint accounts were properly retained by Cynthia as her property, or should have been included in the estate, is a "pure question of fact" that turns on the donor's intent. *Desrosiers* v. *Germain*, 12 Mass. App. Ct. 852, 856 (1981). See *Campagna* v. *Campagna*, 337 Mass. 599, 604 (1958); *Blanchette* v. *Blanchette*, 362 Mass. 518, 524 (1972). Unless there was donative intent to convey a present interest in the bank account, the gift is testamentary and void. *Id.* at 522. "[A]lthough a joint account conclusively establishes the rights as between a joint tenant and the bank, it is always open to the estate of a deceased joint tenant to prove that there was no intention to create a gift to the surviving tenant." *Desrosiers* v. *Germain, supra* at 855-856. "[A]s between the survivor and the representative of the estate of the deceased, it is still open to the latter to show by attendant facts and circumstances that the deceased did not intend to make a present completed gift of a joint interest in the account," *Miles* v. *Caples*, 362 Mass. 107, 114 (1972), quoting from *Ball* v. *Forbes*, 314 Mass. 200, 203-204 (1943). For example, it could be shown that the joint account was made by the donor for convenience, or by the exercise of undue influence, or that it was intended to hinder, defraud, or delay his creditors, or that it was a gift upon a trust. *Castle* v. *Wightman*,

---

[19]The amount of life insurance proceeds is not reflected in the findings, and could not be clearly ascertained from the evidence.

[20]Gershaw testified that expenses were approximately $60,000 and included "an executrix fee of $9,000."

303 Mass. 74, 76-77 (1939). See *Cormier* v. *Carty*, 8 Mass. App. Ct. 401, 403-404 (1979), *S.C.*, 381 Mass. 234 (1980). Here, there was no indication that the trustees or the executor made any investigation to ascertain whether the joint bank accounts should have been included in the donor's estate and hence in the trust.[21] The trustees were obligated "[t]o make and return to the probate court at such time as it orders a true inventory of all the real and personal property belonging to [them] as trustee[s] which at the time of the making of such inventory shall have come to [their] possession or knowledge." G. L. c. 205, § 1. This includes the obligation to insure the accuracy of the inventory when facts are brought to the trustees' attention that they should do so.

On the record before us, we discern no basis for the dismissal of the counterclaim. There should be further proceedings on the issue whether the bank accounts held jointly by Cynthia and the donor should have been included in the inventory of the donor's trust estate.

c. *Sale of premises.* The trust gives the trustees broad discretion to sell, to convey, or otherwise to manage the trust property, both by the specific enumerated powers set forth in the trust and in the stated intent of the donor, at art. six, last paragraph, "to give the Trustees wide discretion in matters of management of the Trust property." Based on his subsidiary findings,[22] the probate judge's ultimate finding that Gershaw's plan to sell the premises and to make provision out of the proceeds for Bur-

---

[21]As generally stated, the rule is that "[t]he burden of proof is on the party who contends that the transaction is not to be taken at face value." *Desrosiers* v. *Germain*, 12 Mass. App. Ct. at 856. However, we leave open the question whether, in these circumstances, the burden shifted to Cynthia who, as executrix, had a fiduciary relationship with Burton. See, e.g., *Cleary* v. *Cleary*, 427 Mass. 286, 294-295 (1998); Loring, A Trustee's Handbook § 8.24 (Rounds ed. 2001).

[22]The probate judge found that the Everett property was, at the time of trial, in disrepair, that the roof leaked, and that a new roof was needed as efforts to repair it had not been successful. Two of the four units required lead paint removal, at considerable cost. Anya lived in one of the four units, while Burton lived in another. As a result of "their loud and eccentric behavior, including their refusal to permit contractors to make necessary repairs to the building, the apartment generates income of only $500 per month, while total monthly expenses exceed $2,000." The probate judge also found that the trustee's rejection of Burton's general proposal that he manage the property

ton's maintenance as well as the educational needs of Ace and Julie constituted a reasonable exercise of his discretionary authority under the trust was not plainly wrong. See *Boston Safe Deposit & Trust Co.* v. *Lewis*, 317 Mass. 137, 140 (1944).

d. *Refusal to appoint guardian ad litem.* Burton claims that it was error for the judge to deny his request that a guardian ad litem be appointed to represent his interests.

"[T]he rule at the common law was that at least where there had been no adjudication of unsoundness of mind and no guardian or committee appointed and the mental trouble was not shown to be congenital, a non compos defendant of full age in an action at law must appear by attorney, and the failure to appoint a guardian ad litem was not error." *Cunningham* v. *Davis*, 175 Mass. 213, 217 (1900). See, e.g., *Willett* v. *Webster*, 337 Mass. 98 (1958).

"In suits in equity the general practice is to appoint a guardian ad litem for insane litigants," *McKenna* v. *Garvey*, 191 Mass. 96, 100 (1906), and, in some circumstances, the appointment of a guardian ad litem is mandatory.[23] In other equity cases, the appointment of a guardian ad litem is discretionary. See, e.g., G. L. c. 201, § 34.

Apart from its statutory authority, "the Probate Court may appoint a guardian ad litem whenever the court believes it necessary to protect the interests of a person in a proceeding before it." *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373

---

was not an abuse of discretion. It appears that, following the entry of the judgment below, the property was sold.

[23]For example, the Probate Court must appoint a guardian ad litem for minors as well as undetermined and legally incompetent heirs to a will upon allowance of a final account when such persons are not represented. G. L. c. 206, § 24; *Neafsey* v. *Chincholo*, 225 Mass. 12, 15-16 (1916). In a probate proceeding the court must appoint a guardian ad litem for an incompetent surviving spouse, G. L. c. 192, § 1B; and omitted children or incompetent issue, G. L. c. 192, § 1C, during the pendency of the probate of a will. If a litigant has been adjudicated incompetent, and "[i]f an . . . incompetent person does not have a duly appointed representative, he may sue by his next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an . . . incompetent person not otherwise represented in an action or shall make other order as it deems proper for the protection of the . . . incompetent person." Mass.R.Civ.P. 17(b), 365 Mass. 763 (1974). See *Judge Rotenberg Educ. Center* v. *Commissioner of the Dept. of Mental Retardation (No. 4)*, 424 Mass. 476, 479 (1997).

Mass. 728, 755 (1977), citing *Buckingham* v. *Alden*, 315 Mass. 383, 387 (1944). Compare *Darling* v. *Pinkham*, 9 Mass. App. Ct. 885, 886 (1980) (court need not appoint guardian ad litem for ward under conservatorship in petition to partition action where his interests were not adverse to the conservator's). Although we accord great deference to a probate judge in the exercise of his discretionary authority to appoint a guardian ad litem, particularly where the mentally ill person is represented, *Adoption of Kirk*, 35 Mass. App. Ct. 533, 536 (1993), "[w]henever genuine question arises in the trial of a cause whether a party to an action is capable of conducting the litigation by reason of minority or mental incapacity, it is the duty of the court to ascertain the fact and in case a finding is made that such incapacity exists to cause some competent person to be appointed to conduct the litigation." *Sullivan* v. *Judges of the Superior Ct.*, 271 Mass. 435, 437 (1930).

In this case, the findings reflect that the judge was aware that Burton had, throughout much of his lifetime, suffered from mental or emotional instability, had been hospitalized psychiatrically, and was the recipient of Social Security disability payments on account of his mental and physical disabilities. Also, Burton was unrepresented at the time of trial. On the other hand, the evidence reflects that Burton is an educated individual who spoke intelligently during the proceedings and seemingly was able to participate in his own defense. There is no requirement under the statutes or the rules of civil procedure that a guardian ad litem be appointed to represent Burton. It was a matter within the discretion of the trial judge, and there was no abuse of that discretion.

However, because the question is close and as this matter will require further hearing, we encourage the Probate Court judge on remand to review the need for the appointment of a guardian ad litem.[24] In this connection, the judge may consider that a finding of competence in some areas does not preclude a finding that Burton is not competent to conduct the within litigation; the interests Burton seeks to defend, and the claims he

[24]Burton's brief and other documents prepared by him for this appeal were disjointed and unfocussed in part, leaving open the question whether Burton's circumstances since the trial may have changed.

seeks to prosecute, are adverse to those of the fiduciaries; and Burton's particular disability may be found to affect Burton's ability to distinguish between emotional as compared to legal issues, or to act in his interests. Moreover, if Burton continues to be unrepresented by counsel, the Probate Court judge may also consider the need for guidance in formulating appropriate mechanisms to allow the trust to provide Burton with housing without adversely affecting his disability payments.

e. *Apportionment of fees and costs, appointment of cotrustee.* In light of our decision, the issue of apportionment of fees and costs must also be reconsidered, as must the trustees' accounting forming the basis of the distribution of trust assets between Cynthia and Burton.

3. *Conclusion.* We vacate the judgment insofar as it instructs the trustees to divide Burton's share into three separate trusts; to divide certain trust assets and income equally between Burton, Ace, and Julie; to terminate the trust upon distribution to Burton of his share of assets; to pay $23,500 to Cynthia and Ronald; and to pay ninety per cent of Gershaw's fees and costs out of Burton's share. We also vacate that portion of the judgment that dismisses the counterclaim. In all remaining respects the judgment is affirmed.

*So ordered.*